# Cox v. Pennsylvania Railroad Company, Appellant.

*Common carriers—Unlawful discrimination—Siding connection —Act of June 4, 1883, P. L. 72—Treble damages—Distribution of coal cars—Measure of damages—Right to maintain action.*

1. In an action to recover damages for discrimination in refusing a siding connection to plaintiffs who were lessees of a coal mine, plaintiffs are entitled to maintain the action notwithstanding they had subsequent to the demand for siding connection, made an agreement providing for the transfer of the lease to a corporation, where it appeared that the actual transfer did not take place until after the discrimination complained of. The fact that the corporation in its returns to the auditor general during the period in question stated that the mine was the property of the corporation is not material. A recovery by plaintiffs on their legal title would have been a conclusive bar to another action by anyone, and defendant had no reason to complain.

2. The refusal of a railroad company to allow a siding connection to the proprietor of a coal mine is an undue and unreasonable discrimination for which an action will lie. Even though there may be a congestion of traffic and shortage of cars, this does not excuse the company from the duty to treat all shippers alike, and to afford them all equal opportunities to market their product.

3. In an action for such discrimination brought in a court of Pennsylvania, it is not incumbent upon the plaintiff to show what proportion of the total tonnage produced would have been sold within the State. There is no reason in such action for distinguishing between interstate and intrastate commerce.

4. Where in such case the jury has returned a verdict fixing the amount of damages suffered by the plaintiff, it is correct practice for the court to treble the damages upon a rule to show cause; it is not the law that the imposition of the treble damages must be fixed by the jury and not by the court.

5. In the trial of such a case the proper measure of damage is the difference in the market price actually received for coal after the discrimination ceased and the price which would have been received for such coal as could have been mined and shipped, considering all the existing conditions, during the period of the discrimination. The jury should not only consider the capacity of the mine, but should ascertain the quantity of coal which could have been shipped during the period in view of an existing car shortage. Plaintiff is entitled to recover damages for loss arising from the failure to market such coal as he could have marketed had he been supplied with his fair proportion of cars supplied to other shippers, but is not entitled to recover damages based upon the entire productive capacity of the mine. Where the jury ignored the correct instructions of the court in this regard, and rendered a verdict for damages in excess of those proven, and the court in discharging the motion for new trial after the filing of a remittitur overlooked certain evidence which would have still further reduced the amount of the verdict, the case must be reversed for such further action as right and justice may require.

Argued Feb. 18, 1913. Appeal, No. 1, May T., 1912, by defendant, from judgment of C. P. Dauphin Co., Jan. T., 1907, No. 577, on verdict for plaintiffs in case of D. W. Cox and E. E. Lawton v. Pennsylvania Railroad Company. Before FELL, C. J., BROWN, MESTREZAT, STEWART and MOSCHZISKER, JJ. Reversed.

Trespass to recover treble damages for injuries sustained in consequence of refusal of railroad company to furnish siding connection. Before McCARRELL, J.

The opinion of the Supreme Court states the facts.

Verdict for plaintiff for $34,814.50 single damages which was reduced by remittitur to $27,851.60 and then trebled by the court. Defendant appealed.

*Errors assigned* sufficiently appear by the opinion of the Supreme Court.

*John G. Johnson,* with him *C. H. Bergner* and *Lyman D. Gilbert,* for appellant.

*Charles L. Bailey, Jr.,* of *Wolfe & Bailey,* for appellee.

OPINION BY MR. JUSTICE STEWART, March 17, 1913:·

The action was for the recovery of treble damages under the Act of June 4, 1883, P. L. 72, for injury alleged to have been sustained in consequence of the defendant's refusal to furnish a siding connection with a coal mine operated by plaintiffs under a lease. Application for the siding connection was made 11th September, 1902. Some time thereafter the defendant submitted to the plaintiffs a plan, dated 4th October, 1902, showing a proposed siding which, so far as appears, was acceptable to the plaintiffs. Plaintiffs were proceeding with the opening of the mine when on the 14th November they were notified by the defendant that their application for a siding connection was declined. The claim was for damages sustained between January, 1903, when plaintiffs were prepared to ship coal, and August, 1904, when the New York Central Railroad Company by right of eminent domain appropriated the land which plaintiffs had intended for their siding. A verdict resulted to the plaintiffs in the sum of $34,814.50, single damages, afterwards reduced by remittitur to $27,851.60, and then trebled by the court. The appeal is from the judgment so obtained.

It is complained first of all that the court held as a matter of law that the right of action was in the plaintiffs. That plaintiffs were the original lessees of the mine was undisputed. Subsequent to the demand for a siding connection, the White Oak Coal Company, a corporation, was created, in which these plaintiffs were the principal shareholders; and 5th November, 1902, a verbal agreement was entered into providing that when two drifts in the mine were opened to marketable coal, plaintiffs were to transfer the lease to the corporation

for the consideration of $10,000.00 in the capital stock
of the corporation. It was not until 12th January, 1905,
that the contract was fully performed by the transfer of
the lease and the payment of the purchase price. Mean-
while the corporation in its returns to the auditor gen-
eral of the State, during the years in which one of the
plaintiffs was president of the corporation and the other
its treasurer, the reports being certified by them as such
officers, represented that the mine was the property of
the corporation. Appellant contends that on this evi-
dence it should have been submitted to the jury to de-
termine where the ownership of the mine was during the
period for which damages were claimed. Manifestly the
defendant had no other concern with respect to the
question sought to be raised than to protect itself from
a second suit for the same cause of action. It is not
disputed that up until 12th January, 1905, no matter
what control meanwhile the corporation exercised over
the mine, and however it made its reports to the auditor
general, the legal title to the mine was in the plaintiffs.
No assignment or transfer of the lease until then had
been made and no part of the purchase price had been
paid. This being so, the defendant was without reason
to be concerned. A recovery by plaintiffs on their legal
title would have been a conclusive bar to another action
by any one. The law applicable to such case is very
clearly stated in Armstrong v. Lancaster, 5 Watts.
68. GIBSON, C. J., there says: "A legal title is
certainly sufficient for the maintenance of an ac-
tion, excepting, perhaps, where the Commonwealth
stands as a trustee in an official bond; and there
it may be necessary to show a particular injury as
a title to her interference, in order to secure the
obligor from an officious intermeddling.......The
court will undoubtedly search out the actual plain-
tiff, where it is necessary, and fix on him the responsi-
bility of a party, by subjecting him to costs, a plea of
set off, or any other liability that may be necessary to

protect the defendant; but here, where a recovery on the naked legal title would have been a conclusive bar to another action by any one, to set out the equitable title in the declaration was unnecessary. The equitable owner of a right of action can recover on the legal title only; and any one attempting to use it a second time would be repulsed at once by a plea of former recovery. Of all the parties concerned the ostensible defendant had least to do with the equitable ownership. But there may be adverse claimants of it; and how are the rights of a party not named in the record to be protected? Certainly not by preventing a recovery and extinguishing the expectations of himself and every one else. If this judgment were affirmed the party who maintained the contest, under the defendant's shield would have concluded himself, as well as his competitor. What then was his most available course? Obviously to lie by till recovery or to promote it; then to arrest the money in the sheriff's hands by notice not to pay it over, rule it into court, and move for leave to take it out. This done, the pretensions of the claimant could be determined by the court, or a jury, under an issue, as the case might require."

The action of the court in refusing to sustain defendant's contention with respect to this feature of the case stands clear of error.

That the refusal to allow plaintiffs a siding connection was an undue and unreasonable discrimination against them was too clearly established to admit of question. The congested condition of traffic on defendant's road, which was offered in explanation, afforded neither excuse nor extenuation. The means of protection against such condition was in defendant's own hands. It was under no duty to haul more coal than could safely and conveniently be transported over its line; but a bounden duty did rest upon it, in limiting the amount to be accepted by it, because of extraordinary conditions, to show no preference as between shippers,

and to treat all alike on some equitable basis. It was a period of shortage of car supply, and the defendant had adopted a basis of car distribution, a pro rata, based on the productive capacity of the mines. To prevent the opening up of additional mines from increasing the total traffic, a simple reduction of the rate would have been entirely sufficient to that end, and all that plaintiffs were entitled to was to share ratably with others similarly situated in the rate so established. Several points were submitted on behalf of the defendant, asking for instructions to the contrary of the view here expressed. The refusal of these points has been made the subject of several assignments of error. Further discussion of them is unnecessary.

The evidence with respect to sale of cars by defendant to individual shippers had no relevancy to the issue being tried. No more had the evidence with respect to the loading of cars from wagons. All of this evidence should have been excluded, but it is impossible to see how it in the remotest way entered into the final conclusion. Otherwise, it would be ground for reversal.

There was no error in not distinguishing between inter-state and intra-state commerce in this case. It was not incumbent upon the plaintiffs to show what proportion of total tons they would have sold within the State. The case called for no such distinction.

The case of Robbins v. Farwell, 193 Pa. 37, furnished a complete answer to appellant's contention that it was not for court but for the jury to say whether there should be a recovery for treble damages. Here they were trebled upon a rule to show cause. No question is made as to the verdict having been for single damages strictly as directed by the court. This was exactly the situation in the case above cited, where in affirming the action of the court in trebling damages upon rule, this court said, speaking by DEAN, J., "Ever since Welsh v. Anthony, 16 Pa. 254, decided in 1851, the trial courts have exercised the power of doubling or trebling the

damages, or refusing so to do, when it clearly appeared by single damages only were found by the jury, and this court has in a number of cases since Welsh v. Anthony, supra, recognized the authority."

The verdict for single damages was conclusive as to the question of undue and unreasonable discrimination. This left nothing to be considered by the jury in connection with the trebling of the damages. The statute made provision for that. This brings us to the consideration of the only matter remaining.

The facts of the case indicated very clearly the true measure of damage. During the period for which damages were claimed plaintiffs' mine was idle, and wholly unproductive because of the denial of siding connection. In January, 1905, the White Oak Coal Company then being in possession of the mine, a siding connection was furnished and the latter company then began and continued its operation of mining and marketing the coal from the mine. The plaintiffs offered evidence to show, 1st, the productive capacity of the mine; 2d, what the market price of the coal was month by month during the period of their trial of it; and, 3d, the market price for a corresponding period of seventeen months next following when operated by the White Oak Coal Company. By this showing, the price had gradually declined, and the claim was for the difference in market price. Had this measure been strictly observed there would have been but little ground left for the contention. The court's instructions to the jury on this branch of the case were as follows: "Now upon the subject of how much coal could have been mined and shipped there is a wide difference of opinion between the witnesses for the plaintiff and for the defendant........You must satisfy yourselves from the evidence upon this subject with reasonable certainty as to the quantity of coal which might have been mined and shipped, considering all the existing conditions, the difficulties of mining, the water, the rolls in the vein of coal which would delay and make

the mining expensive, and the difficulty in obtaining car supply; you must satisfy yourselves from all the evidence with reasonable certainty as to the quantity which might have been mined and shipped during that period.......You may be aided in that inquiry, gentlemen, by the rating placed upon the capacity of this mine by the defendant company. You will have a tabulation of the rating of the mine at different periods with you. At an early period in the history of the mine, as we recall it, it was rated as having a capacity of three cars a day; you will consider that in ascertaining the quantity which might have been mined and shipped from this mine. You will consider the market price prevailing during the various months when the plaintiffs claim they could have mined and shipped this coal if the siding had been allowed them and the market price prevailing after the time when the sidings were made and shipments were actually permitted and the difference in the market price upon that quantity of coal would be the measure of compensation to which these plaintiffs are entitled, in case you find there was an undue and unreasonable discrimination which they allege."

How widely the jury departed from the measure here given them, is made very apparent by the learned trial judge in his opinion overruling defendant's motion for a new trial, on condition of a remittitur being filed by plaintiffs. He there demonstrates how the jury arrived at their estimate of plaintiffs' loss by taking as a factor the productive capacity of the mine instead of the amount of coal they could have marketed therefrom. He says: "The uncontradicted testimony in this case shows that in this region there has always been an insufficient car supply even when the coal trade was in normal condition. This arose not from any discrimination in car distribution, but from an insufficient number of cars to meet the demands and rated capacity of the mines. There is neither allegation nor proof of discrimination against the plaintiffs in the distribution of the

cars. It seems to us, therefore, that it is reasonably certain that plaintiffs would not have been able in 1903 and 1904 to secure sufficient cars to carry to market Mr. Lawton's estimated quantity of coal, and thus the plaintiffs' estimated sales would have been further diminished. The jury does not appear to have made any deduction whatever from Mr. Lawton's estimation either for reasonably certain delays and difficulties in mining, nor for the reasonably certain impossibilities of procuring the cars necessary to carry the estimated mine product."

The verdict was for single damages. The court directed that upon plaintiffs' filing a remittitur of all excess over $27,851.60, the rule for a new trial should be discharged; and this was accordingly done. This action of the court is assigned as error, and it is contended that the verdict even as reduced by the remittitur is excessive. That the verdict as rendered was in excess of the plaintiffs' just demands was fully demonstrated by the learned trial judge in his opinion refusing a new trial. It would seem the better practice in cases of this kind, when it clearly appears that the jury in reaching its verdict overlooked items or circumstances making in relief of the defendant pro tanto, and which they were directed by the court to consider, but which in themselves furnished no fixed standard for admeasurement as to value, to grant a new trial; but we have no fixed rule requiring it. It is within the discretion of the court to adopt either of two methods of correction: It may grant a new trial outright, or it may grant it on condition that plaintiff refuses to remit so much of the verdict as the court concludes is excessive. Here the latter course was adopted, the court fixing the amount to be remitted which it estimated to be the full equivalent of those matters making in relief of defendant which had been overlooked. This was no more than saying that had the verdict been for this reduced sum the court would have approved it, and a new trial would have been

refused.   Plaintiffs filed the remittitur, and defendant
was protected to that extent by the interference of the
court.  With this determination of the case we would not
interfere were it not that it seems to us apparent from
the record that the learned judge in calculating what
would be the equivalent of those matters making in re-
lief of defendant, and which had been overlooked by the
jury, notwithstanding he had specifically directed at-
tention to them, failed to give consideration to the evi-
dence in the case which seems to have been introduced
by the plaintiffs showing the car supply that plaintiffs
would have been entitled to receive during the period
for which damages are claimed according to the rate of
distribution adopted and based on the productive ca-
pacity of their mines.   We must assume that this evi-
dence was overlooked rather than disregarded for in-
sufficiency, inasmuch as it is not commented upon in any
way.   The learned trial judge rightly held that the dif-
ference in the market price of the coal plaintiffs could
have mined and "shipped" had a siding been allowed
them, and the market price of such coal after the time
the siding was allowed, would be the measure of com-
pensation.   Plaintiffs were without cars of their own,
and for the shipment of their coal would have been en-
tirely dependent upon the defendant company for a
supply.   It being a period of car shortage plaintiffs
could claim only the same proportion of those owned
and controlled by the defendant as was allowed to other
shippers, based on the productive capacity of the several
mines.   If there was evidence that an equitable rate of
distribution had been established—and from our exami-
nation of the record we think there was—such rate
would be a fixed factor in the case for the determination
of the amount of coal that would be shipped.   The fact
that the amount of remittitur ordered by the court is
so much less than it would have been had the rate of car
distribution been considered, is to our mind convincing
that the evidence touching this matter was overlooked,

with the result that we have here a judgment based on the productive capacity of the mines, whereas only, so much of the coal could have been marketed as would have been accommodated in the cars which plaintiffs could rightfully have demanded of the defendant. A new trial of the case ought not to be necessary, but however this may be, what for the present we must regard as a manifest injustice to the defendant calls for correction, and a reversal of the judgment is therefore required, only however that the motion for a new trial in the court below may be reinstated, which is now ordered to be done, the case then to be proceeded with and such action taken thereon as law and justice may require.

The judgment is accordingly reversed, and motion for a new trial reinstated.